John BRADAS et al.

v.

RAPIDES PARISH POLICE JURY et al.

Civ. A. No. 19190.

United States District Court,
W. D. Louisiana,
Alexandria Division.

May 10, 1974.

---

4. Dyotherm Corp. v. Turbo Mach. Co., 434 F.2d 65 (3d Cir. 1970); *cf.* Pasquale v. Finch, 418 F.2d 627, 629 (1st Cir. 1969).

J. Michael Percy, Alexandria, La., for plaintiffs.

Edwin O. Ware, Dist. Atty., Alfred B. Shapiro, Asst. Dist. Atty., Alexandria, La., for defendants.

Richard B. Millspaugh, Opelousas, La., for intervenors.

NAUMAN S. SCOTT, District Judge:

## SUPPLEMENTAL AND AMENDED JUDGMENT

The plan for reapportionment of Rapides Parish was published by our judgment of May 1, 1973 in order to give the greatest possible delay for the accomplishment of mechanical and procedural requirements necessary to the holding of primary elections in the summer of 1974. We now correct certain errors in and assign written reasons for our original judgment.

### AMENDMENTS

1) On Appendix B (map), the yellow voting district lines have been shifted in five places. (The former lines are delineated by white hash-marks and labeled respectively I through V). These alterations account for mere graphic corrections on Enumeration District Lines and, consequently, entail no numerical changes in the plan and corresponding population breakdown. (See Appendix A).

2) On Appendix B, a district line was similarly shifted (VI on the map) to correct the splitting of Ed 79. This required numerical adjustments in District F and G in order to eliminate any estimates. Amended Appendix A (infra) reflects these corrections.

3) On Appendix B, changes VII and VIII were made after conference with the Registrar of Voters and in order to assist him and to preserve, where possible, ward boundaries. By placing the district line along the ward boundary, the voters affected will be able to cast all their votes at one time, in one precinct, rather than splitting their voting duties between two precincts whenever State congressional and Parish elections coincide. Amended Appendix A reveals the population changes by this shift in Districts H. and E. The numerical changes are based on an estimate made from counting dwellings in the affected areas.

4) Appendix A is thus amended. (Attached)

### FINDINGS OF FACT

The parties were instructed to submit apportionment plans consistent with the principles of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973). Four plans were submitted, all of which have been found to have been either insufficiently prepared or constitutionally inadequate or both.

The defendants School Board and Police Jury submitted jointly the apportionment plan under which those bodies are presently operating, which was handed down by judgment of this Court in the Civil Action No. 13,715, entitled LeBlanc, et als v. Rapides Parish Police Jury, et als, dated June 5, 1972. The Police Jury made no other offering and neither the Police Jury nor the School Board offered any evidence in support of this plan. There is little question that this plan is violative of the Fifteenth Amendment. It provided for three (3) multi-member districts and one (1) single-member district. Blacks comprise approximately 27.9% of the Parish population, yet no blacks have been elected to either the Police Jury or the School Board under this plan. Furthermore, as stated in our judgment filed previously herein, "Fifteenth

Amendment rights, though presented, were not sufficiently or adequately presented or adequately considered in the adoption of that plan . . .". That judgment is not res judicata of the question presently at issue.

### SCHOOL BOARD PLAN

■ The School Board offered an alternative eighteen (18) single-member plan. A map attached to the plan revealed that Wards One and Eight were divided into ten (10) single-member districts. The remaining eight (8) districts cover the area north of Red River and the rural areas south of the river. Although the ten urban districts were supported by 1970 census figures showing racial breakdowns, no population data of any kind was submitted in support of the eight rural districts. A review of population figures on only a portion of the Parish was absolutely meaningless for either Fourteenth (14) or Fifteenth (15) Amendment purposes. Deviation figures for the entire Parish could not be ascertained. Consequently on April 19, 1974 additional information was requested. The request was not acknowledged and no response was received. Since there was insufficient information to evaluate the plan it was rejected.

### SCHOOL BOARD MINORITY PLAN

■ A minority (8 members) of the School Board submitted an alternate eleven (11) single-member district plan. Attached to the offering was a map showing 6 single-member districts carved out of Wards 1 and 8, but there was no map or information of any kind showing what areas the remaining 5 members would represent. Complimental information was requested; as in the previous instance no response was forthcoming. Since the plan was incomplete and was unsupported by population figures, there was no basis for evaluation and the plan was rejected.

### PLAINTIFFS' PLAN

■ Plaintiffs submitted a plan calling for eighteen (18) single-member districts. Although the plan was documented and supported by 1970 census figures, the plan exhibited mathematical inaccuracies which rendered the entire plan suspect. For example, the aggregate population of the proposed election districts was significantly smaller than the total population for Rapides Parish. Although the plaintiffs split several enumeration districts no documentary evidence, special census or otherwise, was submitted in support of the population totals assigned each portion of the split districts. These inaccuracies were particularly significant because the plaintiffs' plan permitted a very high deviation of 10.5%. Although the Supreme Court affirmed the adoption of a reapportionment plan for Rockwell County, New York, which provided for an 11.9 deviation, the peculiar facts present in that case are absent here, Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). Although "mathematical exactness or precision is hardly a workable constitutional requirement", Reynolds v. Sims, 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 536 (1964), large deviations can be justified only by legitimate state considerations, Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). The record is devoid of any evidence of State interest requiring or justifying a 10.5% deviation. We find that plaintiffs' difficulty stemmed from their determination to adhere to 18 separate districts. Although the continuation of the current numerical membership of boards may be desirable in many instances, it is not of such significance as to justify a radical departure from the Reynolds mandate. For these reasons the plaintiffs' plan was rejected.

### NINE SINGLE-MEMBER DISTRICTS

■ It was therefore necessary that the Court draft a plan of its own. We

considered several factors to be paramount: (1) adherence to the principle that one man's vote be, as nearly as possible, equal to that of another, (2) protection of Fifteenth Amendment rights, and (3) preservation to every extent possible, of existing ward boundaries in Rapides Parish. We were also conscious of the limitations inherent in Minnesota State Senate v. Beens, 406 U.S. 187, 92 S.Ct. 1477, 32 L.Ed.2d 1 (1973).

■ ■ Fifteenth Amendment rights along with the Fourteenth Amendment rights of "one man, one vote" must be the overriding consideration in the preparation of any reapportionment plan. Single-member districts tend to preserve the voting rights of minorities and are preferable unless multi-member districts are justified by other valid considerations, Connors v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed. 268 (1971).

■ Having experienced the difficulty, indeed the impossibility, of drafting a plan providing for eighteen single-member districts, and after considering numerous alternatives, we determined that the nine single-member district plan was the plan most consistent with the Fourteenth and Fifteenth Amendment principles. In reducing the membership of the School Board and the Police Jury, we are well aware of the holding of Minnesota State Senate v. Beens, supra, regarding the reapportionment of that state's legislature. But Beens does not affect the decision here. Minnesota's statute fixed the number of the State's legislative districts at 67. A three-judge court reduced the number of legislative districts to 35 and the number of senators by almost 50% and the number of legislators by almost 25%. The Minnesota statute provided for a specific number of legislative districts and members of the legislature. The three-judge court's reasons for such reduction were totally unrelated to Fourteenth Amendment requirements. Consequently, the Supreme Court reversed, holding that the three-judge Court could not violate, arbitrarily, and at its convenience the policies of the State of Minnesota as reflected in its apportionment statute. However the Court did not deny that the three-judge court had the power to so reduce, if necessary, to reach constitutional requirements:[1]

> "in summary, the number of a State's legislative districts or the number of members in each house of its legislature raises no issue of equal protection unless the number so prescribed occasions significant and invalidating population deviations." Minnesota State Senate v. Beens, supra, at 199–200.

The pertinent Louisiana statute, LSA-R.S. 17:71.2 provides in part that:

> " . . . [the] school boards may, by majority vote of said board as presently constituted, re-establish itself with not less than five nor more than fifteen members or the number presently authorized for that school board, which ever is the greater."[2]

Unless one asserts that the last clause implies that a Board may consist of any

1. Three judge courts have successfully reduced state legislative bodies when to do so meant to stay *within* state statutes or further State policy. See Paulson v. Meier, 246 F.Supp. 36 (D.C.1965), where the Senate membership was reduced from 53 to 49 and the House reduced from 106 to 98. The North Dakota State Constitution, Article II, § 26 mandated a Senate of 49 members. In Klahr v. Goddard, 250 F.Supp. 537 (D.C.1966), reductions of the Senate from 31 to 30 and of the House from 80 to 60 was consistent with a constitutional provision for a House "not to exceed 80 members." That Court also indicated that the reduction preserved county lines as prescribed by the State's constitution, Article 4, pt. 2 § 1. A three-judge court in Sims v. Amos, 336 F.Supp. 924 (D.C.1972), reduced the Alabama House of Representatives from 106 to 105, pointing out that "The Alabama Constitution is in nowise inconsistent with provision for a 105 man House," at 936.

2. See also L.S.A.–RS 33:1221. It bears noting that these statutes refer to self-reapportionment and therefore are not strictly applicable to the case at hand, i. e. court reapportionment. However, the statutes do clearly enunciate the policy of the State of Louisiana.

number of members, no matter how large, it must be conceded that the policy of the State of Louisiana is to establish a board of not less than 5 nor more than 15 members. A nine-member board is in full compliance with that policy.

The plans submitted by the parties were either incomplete and unsupported or were constitutionally unacceptable. This is a unique situation. In the number of reapportionment suits which have come before this Court we have never been faced with the necessity of producing a plan. We have never adopted a plan which had not been submitted by the parties. Had one or more constitutionally acceptable plans been submitted in this instance, our consideration would have been restricted to a choice of those alternatives. We do not believe or imply that either the Police Jury or the School Board was truculent or uncooperative. The record reflects, however, that despite their overriding interest in retaining an 18 member board, they, like the Court, were unable to submit a constitutionally acceptable plan consistent with that desire. Since acceptable deviations are more easily achieved in a fewer number of large districts, reduction of membership in the boards was inevitable.

The nine-member plan virtually assures the election of two minority members to each nine-member board, Zimmer v. McKeithen, *supra*. It achieves a remarkable average deviation of 0.72% and a maximum deviation of 2.2%. It preserves to a very substantial degree the traditional ward lines and geographical boundaries and thus promotes continuity and an ease in transition from the old plan to the new. These vital considerations provide overwhelming justification for the reduction in members inherent in the nine-man plan as required by *Beens*. We adopt the nine-member plan as amended herein.

This supplemental and amended judgment will serve as the judgment of this Court.

AMENDED APPENDIX "A"

POPULATION BREAKDOWN

IDEAL REPRESENTATION: 1/13,120

| VOTING DISTRICT | BLACK (%) | NON-BLACK (%) | TOTAL | DEVIATION |
|---|---|---|---|---|
| A | 989 (8) | 12,011 (92) | 13,000 | +1.0% |
| B | 2,148 (16) | 11,121 (84) | 13,269 | —1.1% |
| C | 2,980 (23) | 10,161 (77) | 13,141 | —0.2% |
| D | 10,032 (76) | 3,088 (24) | 13,120 | 0% |
| E | 2,576 (20) | 10,462 (80) | 13,038 | +0.6% |
| F | 11,473 (88) | 1,503 (12) | 12,976 | +1.1% |
| G | 611 (4) | 12,428 (96) | 13,039 | +0.6% |
| H | 1,770 (13) | 11,498 (87) | 13,268 | —1.1% |
| I | 396 (3) | 12,831 (97) | 13,227 | —0.8% |
| TOTAL | 32,975 (27.9) | 85,103 (72.1) | 118,078 | |

AVERAGE DEVIATION: 0.72%

MAXIMUM DEVIATION: 2.2%