George WALLACE, Sr., et al.,
Plaintiffs-Appellees,

v.

J. P. HOUSE, Individually and as Registrar of Voters of Concordia Parish, Louisiana, et al., Defendants,

L. W. Davis, etc., et al.,
Defendants-Appellants.

No. 74-2654.

United States Court of Appeals,
Fifth Circuit.

Sept. 17, 1976.

Rehearing and Rehearing En Banc
Denied Oct. 15, 1976.

Norman M. Magee, Ferriday, La., Robert C. Downing, Asst. Atty. Gen., State of La., Dept. of Justice, Monroe, La., for defendants-appellants.

W. C. Falkenheiner, Dist. Atty., Vidalia, La., A. Mills McCawley, Special Counsel, Shreveport, La., for J. P. House.

Paul H. Kidd, Monroe, La., Stanley A. Halpin, Jr., New Orleans, La., for plaintiffs-appellees.

Before GOLDBERG and RONEY, Circuit Judges, and GROOMS, District Judge.

GOLDBERG, Circuit Judge:

This case comes before us for the second time, our earlier decision having been vacated and remanded by the Supreme Court for reconsideration in light of *East Carroll Parish School Board v. Marshall*, 1976, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (per curiam), and Public Law 94–73 [42 U.S.C. § 1973*l*(e)].[1]

*East Carroll* purports to defoliate the political thicket in which we have been wandering for some years. In our travels, we had, whenever possible, sought guidance from the local legislature, thereby seeking the goal of judicious redistricting through some constitutional route proposed by a representative body. We traversed this path in our original opinion, holding that where an existing apportionment plan has been held unconstitutional and the district court is put to the task of fashioning a remedial plan, it ought to defer to a constitutional plan preferred by the local legislative body. The Supreme Court's contemporary cartography commended this route to us.

In *East Carroll*, however, the Court declaimed that when the legislative body has once strayed from the path of constitutional rectitude and the district court is charged with fashioning a remedial apportionment plan, the court need pay no heed to the legislative preference for at-large districts. The Board of Aldermen of Ferriday, Louisiana, left that constitutional path by imposing on the town's citizens an all-at-large

---

1. *Wallace v. House*, 1976, —— U.S ——, 96 S.Ct. 1721, 48 L.Ed.2d 191, vacating and remanding, 5 Cir. 1975, 515 F.2d 619.

aldermanic election scheme that diluted the votes of black citizens; we can therefore no longer follow the Board's directions through the thicket. Having cleared away the underbrush, the Supreme Court has given us a route to be followed over all but the most inhospitable terrain: in fashioning remedial districting schemes, federal district courts are to order single-member plans absent special circumstances.

We must review under the guidelines established in *East Carroll* the district court's choice of a single-member reapportionment scheme, and under the authority of 42 U.S.C. § 1973*l*(e) the lower court's award of attorneys' fees to plaintiffs. We affirm the district court's judgment on both questions, thereby bringing closer to resolution this dispute between the black citizens of Ferriday, Louisiana, and the Board of Aldermen, which proposed to supplant the town's unconstitutional all-at-large aldermanic election scheme with a plan that would retain one at-large member. To the town's black citizens, the single at-large seat retained in the Board's preferred plan represents the fulcrum of continued white political control.

## I. *The District Court's Choice of Districting Plans*

On June 13, 1972, the black candidates for election to the Ferriday, Louisiana, Board of Aldermen filed this class action under 42 U.S.C. § 1983 in federal district court. Plaintiffs charged that Ferriday's all-at-large voting scheme impermissibly diluted the votes of local blacks and asked for appropriate declaratory and injunctive relief. The court ordered each party to submit alternative redistricting plans. The Board submitted two redistricting plans to

the district court.[2] The plan first submitted (the mixed plan) divided Ferriday into four single-member districts and one at-large district encompassing the entire town. The second plan (the all single-member plan) created five single-member aldermanic districts. A bench trial was held on April 24 and 25, 1974, after which the district court concluded that only single-member aldermanic districts would sufficiently guarantee to black voters the full efficacy of their right of suffrage.

The Court found both the existing all-at-large plan and the Board's preferred mixed plan unconstitutional. The mixed plan was "clearly constitutionally infirm because of the special racially discriminatory effect of that plan in the context of this case." *Wallace v. House*, W.D.La.1974, 377 F.Supp. 1192, 1200. The mixed plan would have created two "safe" white seats and two "safe" black seats. The pivotal at-large aldermanic seat would likely have been controlled by Ferriday's white voting majority.[3] A fairly drawn single-member plan, on the other hand, "ordinarily will result in blacks having a majority in three of the five districts." *Id.* at 1200. The mixed plan was also unconstitutional in the district court's view because, like the existing all-at-large plan, it operated to dilute the voting strength of black citizens and prevented them "from participating equally with white citizens in the political process . . . ." *Id.* at 1199.

On appeal, it was conceded that Ferriday's all-at-large aldermanic election scheme operated to dilute the votes of the black citizens of the town in violation of their Fourteenth and Fifteenth Amendment rights.[4] The problem was whether

---

2. The plaintiffs submitted a plan for five single-member districts that does not differ significantly from the Board's single-member plan.

3. Ferriday's population is closely divided between whites and blacks. The 1970 census showed about 3,000 blacks (58%) and 2,200 whites (42%). Whites enjoy a slight edge in voter registration over blacks, 1,571 (50.5%) to 1,538 (49.5%). Any discrepancy is explained by the fact that there are relatively more

whites of voting age in Ferriday than there are blacks.

4. The Board admitted to this Court at oral argument that plaintiff's dilution case had not been rebutted with respect to the existing all-at-large aldermanic districting scheme and that the existing scheme was unconstitutional. The trial judge properly found the all-at-large plan irremediably defective and correctly ordered the Board to submit a constitutional plan for his approval. 515 F.2d at 624.

the district court made the proper choice between the alternative plans submitted by the Board of Aldermen. We held that the trial court was mistaken in adopting a *per se* rule that even a single at-large aldermanic seat would have the same pernicious effect as the previously all-at-large scheme, that the Board's mixed plan was not unconstitutional, and that the Board's preference for the mixed plan must override the district court's preference for the all single-member plan. 515 F.2d at 632, 636. Our panel decision was vacated and remanded by the Supreme Court for reconsideration of this question in light of *East Carroll.*

In *Zimmer v. McKeithen,* 5 Cir. 1973, 485 F.2d 1297 (en banc), *aff'd sub nom. East Carroll Parish School Board v. Marshall,* 1976, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (per curiam), we reversed a district court decision approving an at-large reapportionment plan submitted by the East Carroll Police Jury. A district court had ordered a change from ward to at-large voting in East Carroll Parish in 1968. The Parish Police Jury subsequently resubmitted the at-large plan pursuant to a district court order to submit a reapportionment plan in light of the 1970 census. Black voters in *East Carroll* challenged the propriety of the plan under, *inter alia,* the Fourteenth and Fifteenth Amendments. The district court found that the at-large plan did not dilute black voting strength and ordered police jury and school board elections under the at-large plan.[5] A panel of the Fifth Circuit affirmed, 467 F.2d 1381, but on rehearing *en banc,* this Court reversed, 485 F.2d 1297. We found clearly erroneous the trial court's findings that at-large elections would not dilute the black voting strength of East Carroll Parish.

In affirming our *en banc* decision, the Supreme Court found it unnecessary to reach the constitutional merits of the proffered at-large plan. The Court held simply that the district court had abused its discretion in failing initially to order a single-member reapportionment plan. The Court reaffirmed the rule "that when United States district courts are put to the task of fashioning reapportionment plans to supplant concededly invalid state legislation, single-member districts are to be preferred absent unusual circumstances." 424 U.S. at 639, 96 S.Ct. at 1085. Had the Court been articulating a new test, a remand might have been appropriate. But the Court, finding it "inexplicable" that our *en banc* opinion had declined to rest on this "frequently reaffirmed" rule, did not remand to determine whether there were special circumstances. Instead, the Court reasoned that the *en banc* opinion "amply demonstrates [that] no special circumstances here dictate the use of multimember districts."

■ *East Carroll* makes clear that in fashioning remedial relief subsequent to finding an existing apportionment plan unconstitutional, a federal district court must, absent special circumstances, order a single-member reapportionment plan. A district court need not reject an all-at-large or mixed plan as unconstitutional in order to justify its choice of an all-single-member plan. A reviewing court need not reach the constitutionality of the mixed plan to decide whether the district court's choice was proper. When district courts are forced to fashion reapportionment plans, the general rule is that single-member districts are to be preferred. *East Carroll, supra,* 424 U.S. 639, 96 S.Ct. at 1085; *Chapman v. Meier,* 1975, 420 U.S. 1, 17–19, 95 S.Ct. 751, 761–62, 42 L.Ed.2d 766, 778–80; *Mahan v. Howell,* 1973, 410 U.S. 315, 333, 93 S.Ct. 979, 989, 35 L.Ed.2d 320, 335; *Connor v. Williams,* 1972, 404 U.S. 549, 551, 92 S.Ct. 656, 658, 30 L.Ed.2d 704, 707; *Connor v. Johnson,* 1971, 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (per curiam).

■ Two paradigm situations will arise under this rule. In the first paradigm, a

---

5. Under this scheme, six of the seven wards were to elect one representative to the police jury and school board, and one ward was to elect three representatives. Although candidates were required to reside in the ward from which they sought election, they were to be voted upon by registered voters in the entire county. 485 F.2d at 1301.

district court departs from the favored single-member plan and chooses a plan containing at least one at-large district. In this case the trial court must justify its rejection of the favored alternative by demonstrating that there are special circumstances that mandate this choice.[6] In the second paradigm, the district court orders single-member districting in the first instance. The question on appeal then becomes whether the presumptively proper choice of the district court must be overturned as an abuse of discretion. In *East Carroll* the district court had ordered at-large districting (the first paradigm), whereas here the district court ordered single-member districting (the second paradigm). In that case the question was whether special circumstances justified the district court's choice; in this case the question is whether special circumstances compelled the district court to reject all-single-member districting and to order an at-large district.[7]

Applying the rule reaffirmed in *East Carroll* to the facts of this case requires a three-stage inquiry. First, we must face the threshold question whether it can ever be an abuse of discretion for a district court, having found unconstitutional the existing apportionment plan, to order remedial relief in the form of single-member districting. Second, we shall decide, in light of the unique procedural posture of this case, whether we must remand to the district court for a finding of whether there were "special circumstances." Upon answering this question in the negative, we shall decide whether the district court

abused its discretion by ordering a single-member plan.

*East Carroll* and other cases of the first paradigm tell us that a district court abuses its discretion if it orders at-large or multimember districting absent special circumstances, but they cannot answer the threshold question here. Because cases discussing the matter generally say that a district court may order at-large districts if there are special circumstances,[8] not that a district court must do so, there are grounds for believing that, barring the unconstitutionality of a single-member plan, district courts cannot abuse their discretion by ordering single-member districting. On the other hand, a dictum from *East Carroll* suggests that sometimes the presence of special circumstances will "dictate the use of multimember districts." 424 U.S. at 639, 96 S.Ct. at 1085. We shall assume that special circumstances may conceivably be so compelling that a district court would be required to order some multi-member districting.

On this assumption, however, there may be special circumstances that would suffice to justify a district court's exercise of discretion in ordering at-large districting but would not be sufficient for an appellate court to overturn a district court's discretionary choice of single-member districting. In other words, some special circumstances might justify a choice of at-large districting but would not compel that choice. This distinction is important in the instant case. It means that appellants' burden is particularly heavy, for they must show not merely that the district court could have ordered

---

**6.** *See Chapman v. Meier, supra,* 420 U.S. at 26, 95 S.Ct. at 766.

"We hold today that unless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts . . . .. Where important and significant state considerations rationally mandate departures from these standards, it is the reapportioning court's responsibility to articulate precisely why a plan of single-member districts with minimal population variance cannot be adopted."

**7.** In *East Carroll,* all candidates were to be elected on an at-large basis, whereas here the Board proposed a mixed rather than all-at-large plan. That does not disturb the Supreme Court's preference for single-member districts or obviate the need to show special circumstances. Where a district court's plan involved thirty-seven single-member districts and one multimember district, the Court nevertheless required that special circumstances justify the latter. *Mahan v. Howell,* 1973, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320.

**8.** *See, e. g., Zimmer v. McKeithen, supra,* 485 F.2d at 1308.

**1144**

an at-large district but that on a correct reading of the facts the lower court was compelled to do so as matter of law.

Our second task is to decide whether to remand this case to the district court to decide whether there are sufficiently compelling special circumstances to require an at-large district. Since this case comes to us on remand from the Supreme Court after *East Carroll,* it might be argued that the district court has never had a chance to decide whether there were such special circumstances under *East Carroll's* test and that we should therefore remand. Four considerations prove fatal to this argument.

First, in *East Carroll* itself the Supreme Court faced a situation where, had the test required it, a remand would have been appropriate. The Court nevertheless chose not to remand but reasoned simply that the *en banc* opinion of this Court "amply demonstrates [that] no special circumstances here dictate the use of multi-member districts." It must be remembered that there the district court had ordered an at-large plan, so that defendants needed only to show special circumstances that would justify that decision; here the burden of those seeking an at-large district is to show that such a district was required. If no remand was ordered in the former case, where on this assumption opponents of the single-member plan had a lighter burden to carry, we should be hesitant to remand here. The Supreme Court is forthright with its words and had it wanted us to remand for a finding of fact it would have so ordered.

Second, a basic reason no remand was required in *East Carroll* and none should be required here is that the *East Carroll* Court was not articulating a new test but refining a test first announced in *Connor v. Johnson,* 1971, 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (per curiam). Were there "special circumstances," the district court could not only have found them but also could have denominated them as such. The term, "special circumstances," encompasses only the rare, the exceptional, not the usual and diurnal. Appellants raise no factual matters of which the district court was

unaware. The parties have already waited six years since this litigation began. Elections must soon be held. A remand would serve no useful purpose.

■ Third, it must be recognized that the term "special circumstances" is possessed of no talismanic significance. It merely represents the Supreme Court's recognition that a "singular combination of unique factors" may sometimes permit a district court to conclude that the policies underlying the general preference for single-member districting are outweighed by grave defects of single-member districting as applied to the particular case. *Mahan v. Howell, supra,* 410 U.S. at 333, 93 S.Ct. at 989, 35 L.Ed.2d at 335. The general preference for single-member districting plans is founded on a judgment that the weaknesses of multi-member or at-large plans tend to impair fair representation and impede access to the political process. The practical weaknesses of at-large plans include "their tendency to submerge minorities" *Whitcomb v. Chavis,* 1971, 403 U.S. 124, 158–59, 91 S.Ct. 1858, 1877, 29 L.Ed.2d 363, 384–385, and the possible unresponsiveness of at-large members to residents of particular areas within the district. *See generally Chapman v. Meier,* 1975, 420 U.S. 1, 14–18, 95 S.Ct. 751, 760–62, 42 L.Ed.2d 766. Where application of single-member districting in a particular case reveals greater weaknesses in the single-member plan, however, a district court may decide that creation of at least one at-large district would better serve the values of fair representation and political access.

In the opinion of this court *en banc* in *Zimmer,* Judge Gewin summarized the kinds of circumstances that might justify a district court's choosing an at-large plan. Where the district court's approval of an at-large plan "is challenged merely as an abuse of discretion," *Connor v. Johnson's* preference for single member districts may be overridden when special circumstances obtain:

> Where a district court determines that significant interests would be advanced by the use of multi-member districts and the use of single members districts would

**1145**

jeopardize constitutional requirements, it can employ multimember districts . . . .

The preference may also yield where a district court determines that multimember districts afford minorities a greater opportunity for participation in the political process than do single member districts . . . . [A] court may in its discretion opt for a multi-member plan which enhances the opportunity for participation in the political processes.[9]

One example of a case in which the Supreme Court found special circumstances is *Mahan v. Howell,* 1973, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320. In that case the Court approved the use of multi-member districts as an interim remedy to alleviate substantial underrepresentation of military personnel in an impending election.[10]

Appellants do not allege that the single-member plan would threaten the constitutional rights of some voters, as in *Mahan,* nor do comparable circumstances in fact obtain in this case. In any event, we are not faced with a situation like that in *Mahan* or *East Carroll* where the district court ordered at least some multi-member districting; here the district court ordered single-member districting in the first instance. There is no need to remand to determine whether the single-member plan suffers from grave weaknesses. In endorsing the plan, the district court found that it suffered from no constitutional defects. 377 F.Supp. at 1200. It strains the imagination to suppose that reminding the district court of the appellation, "special circumstances," would inspire it to a vision of the plan's grave weaknesses where before it saw none.

· ■ Fourth, we need not remand to decide whether special circumstances dictate approval of the mixed plan because the district court has already implicitly found that the mixed plan affords the black voting minority not greater but diminished opportunity for access to the political process. To be sure, the district court found that the mixed plan would unconstitutionally dilute the black vote and eventuate in a racially discriminatory result. We did not agree with that constitutional finding in our earlier opinion and need not do so now. The district court's criticism of the mixed plan need not be of constitutional dimension to be decisive under *East Carroll.* The argument is *a fortiori*: because the district court found that the mixed plan unconstitutionally dilutes black voting strength and ordered the single-member plan, it is implicit that the district court decided that the mixed plan dilutes black voting strength to some extent and does not serve the values of fair representation and political access better than the single-member plan.

■ In sum, the present record is sufficient to enable us to determine without remanding whether the district court abused its discretion in ordering the single-member plan. In *East Carroll* itself, the Supreme Court saw no need to remand. That single-member districting is to be preferred "absent special circumstances" by a district court shaping remedial relief is not a new test announced in *East Carroll* but an existing rule reaffirmed in that case. The district court has already decided that the single-member plan jeopardized no constitutional requirements. Finally, the district

---

**9.** *Zimmer, supra;* 485 F.2d at 1308. The Supreme Court seems to have understood Judge Gewin to be establishing only the circumstances under which an at-large plan would be constitutional. *East Carroll, supra,* 424 U.S. at 639, 96 S.Ct. at 1085, 47 L.Ed.2d at 298. But Judge Gewin is here addressing the limits of judicial discretion in ordering an at-large plan assuming there is no question of its constitutionality.

**10.** In *Mahan, supra,* 410 U.S. at 333, 93 S.Ct. at 989, the Court stated that the district court

ᵏwas confronted with plausible evidence of substantial malapportionment with respect to military personnel, the mandate of this Court that voting discrimination against military personnel is constitutionally impermissible, *Davis v. Mann, supra,* 377 U.S. [678] at 691–692, 84 S.Ct. [1441, at 1448, 12 L.Ed.2d 609], and the fear that too much delay would have seriously disrupted the fall 1971 elections. Facing as it did this singular combination of unique factors, we cannot say that the District Court abused its discretion . . .."

court did not find that the mixed plan affords minorities a greater opportunity for participation in the political process than the all single-member scheme. Rather, its constitutional objections to the mixed plan imply a finding that the mixed plan is, at the very least, not superior to the single-member plan in this respect.

█ Having determined that we need not remand, we must now decide whether the district court abused its discretion. Although *East Carroll, Mahan,* and other cases considered were instances of the first paradigm, where the district court orders multi-member or at-large districting, these cases lead us to conclude that when the district court orders remedial relief in the form of single-member districting in the first instance, an appellate court may overturn that presumptively proper choice only if (1) the findings of fact from which the district court failed to discern special circumstances are clearly erroneous, or (2) the failure to discern special circumstances from the facts found is an abuse of discretion as a matter of law. Since the facts are not contested, here appellants must show that special circumstances did exist on the facts found and that such special circumstances are sufficiently compelling to dictate the choice of the mixed plan.

█ For purposes of this case, we need not delimit precisely how compelling such a showing of special circumstances must be in order to preclude the district court from exercising its discretion to choose an all-single-member plan. We decide only that no sufficient showing of special circumstances has been made to justify such a holding here. Appellants argue only that the mixed plan will provide substantial political participation to both blacks and whites and that since voting strength is almost equally divided between the black and white population this balance constitutes a "special circumstance." The first consideration hardly suffices to dislodge the preference accorded single-member districting. That an at-large plan affords minorities greater political access is a necessary though perhaps not sufficient condition for holding that a district court cannot choose single-member districting. The second argument is equally meritless. Blacks constituted a majority of the population of East Carroll Parish,[11] but the Supreme Court did not even pause to consider that fact in finding that there were no special circumstances. The balance of voting strength is not of independent importance in showing "special circumstances," but may be relevant insofar as it demonstrates that an at-large or mixed plan might afford minorities greater political access or that a single-member plan is constitutionally defective. No such showing is made here.

There is no reason to think the district court should have found "special circumstance" that would override the general preference for single-member districting. There is no indication that the at-large provision would better serve the values of equal representation and access to the political process—indeed, the findings of the district court suggest precisely the contrary. Because any showing of "special circumstance" would gain persuasive force only by appeal to such values, we cannot say that the district court abused its discretion in choosing the single-member plan.

II. Attorneys' Fees

█ The district court awarded attorneys' fees to plaintiffs on the basis of the "common benefit" and "private attorney general" rationales. We found the common benefit rationale inapposite [12] and the pri-

---

11. In East Carroll Parish, as of October, 1971, there were 3,342 whites and 777 blacks registered on the East Carroll rolls and an additional 2,122 federally registered black voters in the parish. *Zimmer, supra,* 485 F.2d at 1301.

12. We found the common "benefit" or "fund" rationale of *Mills v. Electric Auto-Lite Company,* 1970, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593, inapposite because there was neither a fund created by the litigation nor any indication that an award of attorneys' fees against the Board of Alderman would spread the costs of litigation proportionately among the members of the benefited class. *Wallace v. House, supra,* 515 F.2d at 636.

vate attorney general rationale precluded by *Alyeska Pipeline Service Company v. Wilderness Society,* 1975, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141. In *Alyeska,* the Supreme Court held that the private attorney general rule cannot support the award of attorneys' fees in federal cases in the absence of a statutory mandate. At the time of the district court's decision, although its use of the private attorney general rationale comported with the then-prevailing rule in this circuit,[13] there was no statutory mandate. After *Alyeska,* however, Congress amended the Voting Rights Act to permit a court in its discretion to award attorneys' fees to the prevailing party in any action or proceeding to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. 42 U.S.C. § 1973*l*(e).[14] The question is thus whether the statute may be applied retroactively to a case on appeal at the time of its enact-

ment.[15] We hold that § 1973*l*(e) should be applied retroactively to allow the award of attorneys' fees in the present case.

This issue is squarely controlled by our decision in *Ferguson v. Winn Parish Police Jury,* 5 Cir. 1976, 528 F.2d 592, 599 n. 13.[16] We held in that case that § 1973*l*(e) should be applied retroactively to allow the award of attorneys' fees while the issue of fees was on appeal. In *Ferguson,* as in this case, the district court's award of attorneys' fees antedated enactment of the statutory authorization.

■ The appropriate test for the retroactive application of amendments permitting awards of attorneys' fees in cases pending on appeal was articulated by the Supreme Court in *Bradley v. School Board of City of Richmond,* 1974, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476.[17] Bradley directs courts to apply the law in effect at the

---

13. *See, e. g., Fairley v. Patterson,* 5 Cir. 1974, 493 F.2d 598; *Lee v. Southern Homesites Corp.,* 5 Cir. 1971, 444 F.2d 143. *Alyeska* specifically disapproved our *Fairley* and *Lee* decisions, 421 U.S. at 270, 95 S.Ct. at 1628 n. 146.

14. 42 U.S.C. § 1973*l*(e) provides:
    In any action or proceeding to enforce the voting guarantees of the fourteenth and fifteenth Amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
    This provision was passed in reaction to *Alyeska. See* S.Rep. 94–295, 94th Cong., 1st Sess. 39–43, 1975 U.S.Code Cong. & Admin.News 806–810.

15. The legislative history of the amendment does not indicate clearly whether the attorney's fee provision was intended to have retroactive affect. The Senate Report, note 14 *supra,* observes:
    Before May 12, 1975, when the Supreme Court handed down its decision in *Alyeska* . . . many lower Federal courts followed these Congressional policies and exercised their traditional equity powers to award attorneys' fees under earlier civil rights laws as well.
    These pre-*Alyeska* decisions remedied a gap in the specific statutory provisions and restored an important historic remedy for civil rights violations. However, in *Alyeska,* the Supreme Court held that the federal courts did not have the power to grant fees to "private attorneys general," or private enforcers of civil rights laws, except under stat-

utes whose language specifically authorizes such fee awards.
    The *Alyeska* decision created an unexpected and anomalous gap in our civil rights laws whereby awards or fees are barred in the most fundamental civil rights cases. . . .
    Section 403, like section 402, provides the specific statutory authorization required by the court in *Alyeska.*

16. *See also Nevett v. Sides,* 5 Cir. 1976, 533 F.2d 1361, 1365 n. 5; *Hall v. Issaquena County Bd. of Supervisors,* 5 Cir. 1976, 526 F.2d 711, 712.

17. In *Bradley,* plaintiffs had prevailed in their suit under 42 U.S.C. § 1983, to desegregate the public schools of Richmond, Virginia, and were awarded attorneys' fees on May 26, 1971. On July 1, 1972, Congress enacted section 718 of Title VII of the Emergency School Aid Act, which granted authority to a federal court to award a reasonable attorneys' fee when appropriate in a school desegregation case. 20 U.S.C. § 1617. Upon appeal of the award of attorneys' fees, the Fourth Circuit Court of Appeals reversed, holding that the absence of any explicit statutory authority at the time the suit was initiated precluded the award of attorneys' fees. The Supreme Court affirmed the district court, however, holding that absent statutory direction to the contrary, a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice. *Bradley, supra,* at 711, 94 S.Ct. at 2016.

time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary. *Bradley, supra,* 416 U.S. at 711, 94 S.Ct. at 2016.[18]

Neither the statute nor its legislative history need give us pause in retroactively applying § 1973*l* (e).[19] Nor can it be argued that retroactive application results in "manifest injustice" by unfairly escalating the substantive obligations of the defendant.[20] At the time this action was commenced and until well after the district court's decision, the prevailing rule in this circuit was to allow awards of attorneys' fees under the private attorney general rationale. Retroactive application of § 1973*l* (e) represents merely an unexpected alternative rationale for the district court's award, which was otherwise entirely consistent with the reasonable expectations of the parties.

"One man, one vote" postulates an equivalence not easily achieved. Without the awarding of attorneys' fees, the concept could neither have emerged nor matured. The statute was passed to remove the infirmities of *Alyeska*. If retroactivity is a therapy, it should be applied.

The judgment of the district court is

AFFIRMED.

---

**18.** Relying on Chief Justice Marshall's holding in *United States v. Schooner Peggy,* 1801, 5 U.S. (1 Cranch.) 103, 2 L.Ed. 49, the court expressly rejected the notion that "a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature." *Bradley, supra,* 416 U.S. at 715, 94 S.Ct. at 2018.

**19.** *See* note 15, *supra.*

**20.** *See Latham v. Chandler,* N.D.Miss.1976, 406 F.Supp. 754, 755–56 (no "manifest injustice" in exercising discretion to allow award of attorneys' fees for services rendered before enactment of § 1973*l* (e) despite initial refusal to grant attorneys' fees at time of preliminary hearing); *Torres v. Sachs,* S.D.N.Y.1975, 69 F.R.D. 343, 344–45 (no "manifest injustice" to award attorneys' fees where voters successfully challenged city's procedure of conducting elections in English and cases were still pending when section 1973*l* (e) was adopted).