**Thomas R. PARNELL et al.**

v.

**RAPIDES PARISH SCHOOL BOARD et al.**

**Civ. A. No. 760364.**

United States District Court,
W. D. Louisiana,
Alexandria Division.

Sept. 30, 1976.

---

Stanley A. Halpin, Jr., New Orleans, La., for plaintiffs.

James J. Brady, Alexandria, La., for defendants.

John F. Ward, Jr., Baton Rouge, La., Richard B. Crowell, Alexandria, La., for intervenors.

Gerald W. Jones, John P. MacCoon, Dept. of Justice, Washington, D. C., for the government.

EDWIN F. HUNTER, Jr., Senior District Judge:

The history of litigation involving the reapportionment of the Rapides Parish Police Jury and School Board is set out in *Bradas v. Rapides Parish Police Jury*, 508 F.2d 1109, at 1110–1111 (5th Cir. 1975). The reapportionment plans for the Rapides Parish Police Jury and School Board, challenged in the instant action under the Fourteenth and Fifteenth Amendments, were originally instituted and approved by a Federal Court in *LeBlanc v. Rapides Parish*

*Police Jury,* Civil Action No. 13,715 (W.D. La., July 26, 1971).

The sequence of the litigation is pertinent:

(1) By judgment of July 26, 1971, in a prior suit entitled *LeBlanc et al. v. Rapides Parish Police Jury et al.,* Civil Action No. 13,715, the district court approved the *LeBlanc* Plan. The plan divided the eleven (11) wards of Rapides Parish into one single-member and three multi-member districts for the purpose of electing 18 officers to the Parish Police Jury, as well as to the Parish School Board.

(2) A year after implementation of *LeBlanc,* the United States instituted an action seeking to nullify the plan because it lacked prior approval of the Attorney General of the United States, pursuant to Section 5 of the Voting Rights Act of 1965.

(3) The district judge dismissed the suit, holding that Section 5 did not require prior approval of reapportionment plans submitted to a United States District Court in the trial of an adversary proceeding (*United States v. Rapides Parish School Board, et al.,* Civil Action No. 19,209, W.D.La., October 25, 1973).

(4) Subsequently, ten parish citizens, both blacks and whites, brought suit attacking the *LeBlanc* Plan as violative of the one man-one vote rule. Plaintiffs charged also that the at-large voting scheme impermissibly diluted the votes of local blacks and asked for appropriate declaratory and injunctive relief.

(5) The District Court, in May of 1974, vacated its judgment of July 26, 1971, which had instituted *LeBlanc.* The court proceeded to implement its own reapportionment scheme which divided the parish into nine single member election districts. *Bradas v. Rapides Parish Police Jury,* 376 F.Supp. 690 (W.D.La., 1974). It did so only after rejecting four plans submitted jointly by the School Board and Police Jury, all of which were found to be either insufficiently prepared or constitutionally defective.

(6) On February 14, 1975, the United States Court of Appeals for the Fifth Circuit, in *Bradas v. Rapides Parish Police Jury,* 508 F.2d 1109, vacated the district court order of May, 1974. The case was remanded with directions to reinstate *LeBlanc* prior to the next election for police jury and school board scheduled to be held in Rapides Parish.

(7) Meanwhile, Judge Scott's single member district plan had been put into effect and two black members had been elected to the Rapides Parish Police Jury and two had been elected to the School Board.

(8) The Court of Appeals decision stated:

To prevent needless expense and confusion, the tenure in office of the present members of the Police Jury and School Board, elected under the 9 member plans of the May 10, 1974 judgment, shall not be disturbed in the interim.

(9) On July 31, 1975, Judge Scott granted the application of the School Board, the Police Jury, and the plaintiffs for a compromise settlement of the *Bradas* case. The effect of this settlement was to keep in effect the nine single member district plan. Plaintiffs and both public bodies favored the plan.

(10) On August 8, 1975 the Court of Appeals granted a petition for a writ of mandamus, vacating and setting aside Judge Scott's approval of the compromise settlement. This order directed forthwith compliance with its mandate of February 13, 1975.

(11) On September 24, 1975, Judge Scott entered an order pursuant to the Fifth Circuit mandate. This resulted in once again activating the LeBlanc multi-member district plan. Police jury elections were held, and the two black members of the Rapides Parish Police Jury elected under the single member plan ran as incumbents and were defeated. There are now no black members on the Rapides Parish Police Jury.

(12) On April 2, 1976 the present suit was filed. LeBlanc is again under attack.

(13) A trial was held on the merits on July 12, 1976.

(14) At this stage, 18 members of the Police Jury had been elected and were serv-

ing in that capacity. It must be emphasized that the Police Jury election was held pursuant to specific and precise court orders. The election of school board members was scheduled for August, 1976.

(15) Attorneys for plaintiffs and the incumbent school board (the 9-member board) requested a stay until the disposition of the present litigation.

(16) We declined to issue the stay order because of the Fifth Circuit's decision in *Bradas* and the mandamus of August 7, 1975. The reasons for the denial were set forth in a written opinion filed immediately after the conclusion of the July 12th hearing.

(17) On July 29, 1976 the Court of Appeals entered the following order:

The order of the District Court denying an injunction is stayed pending appeal and the cause is remanded to the District Court for the entry of appropriate orders to effectuate a legal election under present facts and law, freed from the restraint of a prior mandamus entered by this Court.

(18) Upon receipt of the July 29, 1976 ruling we immediately granted the stay requested by plaintiffs.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

(1) This is a class action pursuant to 42 U.S.C. § 1983. Plaintiffs seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, a preliminary injunction, a permanent injunction and other appropriate relief to enjoin the deprivation under color of law, by the State of Louisiana and in particular the School Board and Police Jury of Rapides, Louisiana, of the rights, privileges and immunities of the plaintiffs and the class they represent, arising under the Constitution of the United States.

(2) Plaintiffs Thomas R. Parnell, Granvel G. Metoyer, and Frazier Bell are black citizens of the United States and residents and registered voters of Rapides Parish, Louisiana.

(3) The plaintiffs have standing to sue individually and properly sue as representatives of the class of black voters of Rapides Parish, Louisiana.

(4) The Rapides Parish School Board is a legislative body charged with the operation of the public schools in Rapides Parish.

(5) The Rapides Parish Police Jury is the legislative governing body of the Parish of Rapides, whose duties include the maintenance of roads, canals, drainage and other public services throughout the Parish including the operation of the Coliseum, operation of the Food Stamp program, and other functions for which the Police Jury appoints special commissions.

(6) Defendant Edwin Edwards is Governor of the State of Louisiana and Defendant Wade O. Martin, now succeeded in office by Paul Hardy, is Secretary of State of Louisiana. These are nominal defendants who have certain duties with respect to the conduct of elections for the Rapides Parish Police Jury and School Board and are included for purposes of relief only. An answer was filed on their behalf by the Attorney General of Louisiana, waiving appearance and praying that the court enter such judgment and orders as it determines are necessary and proper in view of the law and evidence controlling.

(7) The United States was allowed to file a memorandum as *amicus curiae* which supported plaintiffs' position.

(8) To assure that all parties alleging an interest in this litigation would have notice and intervene at an early date without delay of these proceedings, this court issued an order on April 22, 1976 which was published in the local newspapers setting a time in which interventions would be considered.

(9) In response to this order certain individuals who were then police jurors-elect sought and were allowed intervention, and upon assuming office were made defendants herein.

(10) The plan challenged herein is a court-ordered plan instituted by this court in *LeBlanc v. Rapides Parish Police Jury,*

C.A. No. 13,715 (W.D.La., July 26, 1971), hereinafter referred to as the *LeBlanc* plan.

(11) The *LeBlanc* plan was challenged as racially discriminatory under the standard of *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), invalidated, and a nine single-member district plan was substituted for it in *Bradas v. Rapides Parish Police Jury et al.*, 376 F.Supp. 690.[1]

■ (12) The Supreme Court of the United States, in *East Carroll Parish School Board v. Marshall*, 1976, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296, defoliates "the political thicket in which we have been wandering for some years." *Wallace v. House*, 538 F.2d 1138 (5th Cir., 1976). The law now is clear. In fashioning remedial districting schemes, federal district courts are to order single member plans, absent special circumstances.

■ (13) The term "special circumstances" is possessed of no talismanic significance. It merely represents the Supreme Court's recognition that a "singular combination of unique factors" may sometimes persuade a district court to conclude that the policies underlying the general preference for single member districts may be outweighed by grave defects of single member districting as applied to a particular case. *Wallace v. House*, supra.

(14)ˑ No showing of special circumstances has been made to justify such a holding in this case.

■ (15) Accordingly, plaintiffs must prevail as a matter of law on the proposition that the *LeBlanc* plan is an impermissible scheme for a court ordered plan under the standards of *East Carroll*, supra, 96 S.Ct. at 1085, and *Wallace v. House*, supra.

■ (16) Cognizant of Justice Brandeis' well known principles of judicial self-restraint, see *Ashwander v. TVA*, 297 U.S. 288, 346–347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), which includes the principle that the Court should not decide a constitutional question where there is an alternative non-constitutional basis for disposing of the case, we find that the interest of judicial economy and the need for a prompt final resolution of this case dictate that the Court also reach the constitutional question.

■ (17) Under the totality of the circumstances of the instant case, the *LeBlanc* plan with its large multi-member districts operates to minimize or cancel out the voting strength of the sizable black minority in Rapides Parish and operates to deny to them equal access to the political process under *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

(18) Within District A reside 23,647 of the Parish's total black population of 32,882. Thus, 72% of the total black population of the Parish resides within this 10–member district. (See plaintiffs' Exh. 2, 1970 Census, Louisiana General Population Characteristics.)

(19) Examination of plaintiffs' Exh. 1, 1970 Census for Rapides Parish by enumeration districts and part of plaintiffs' Exhibit 11, Census Enumeration District maps for the Parish of Rapides, reveals that in fact this large black population contained within District A is exceedingly compact and is concentrated in an area along the railroad tracks lying in the northwestern sector of the City of Alexandria and adjacent areas immediately outside of the City.

(20) There has been a continuing history of state and local official racial discrimination in Rapides Parish which, prior to 1954 has extended to deprivation of the rights of blacks to register and vote and to participate in a democratic process.

■ (21) We take judicial notice of the school desegregation case against the Rapides Parish School Board and note, as was attested to by plaintiffs' witnesses, that the schools were historically segregated according to race. The schools were desegregated step-by-step with each step being compelled

---

1. The chronology has been set forth in paragraphs 1–18. No useful purpose would be served by reiterating under these findings.

by a specific order of the federal courts. Under freedom of choice in the late sixties and early seventies, only a handful of blacks attended the formerly all-white schools and it was not until imposition of a court-ordered zoning plan that a reasonably substantial number of blacks were in formerly all-white schools and it was not until imposition of a court-ordered zoning plan that a reasonably substantial number of blacks were in formerly all-white schools and vice versa. The litigation continues to this day.

(22) The court notes that there were a number of statewide obstacles to black registration and voting which were in operation until declared invalid in *Louisiana v. United States*, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 209 (1965). Until invalidated by the Voting Rights Act of 1965, a literacy and constitutional interpretation test was in force.

(23) The effects of these obstacles can be seen from plaintiffs' Exhibit 9, Louisiana Board of Registration Report, showing black and white registration at six-month intervals since 1958. This exhibit shows that as of November, 1964, there were 36,197 whites registered in the Parish and by November, 1967 there were 44,336 whites registered—an increase of only 10% from 1964 to 1967. In November, 1964, only 3,829 blacks were registered, whereas in November, 1967, 8,675 blacks were registered—an increase of 127%. From these figures it can also be calculated that, for example, in November of 1964 blacks comprised only 11% of the total Parish electorate, whereas in 1967 they comprised 20% of that electorate.

(24) There are debilitating vestiges of the past which preclude blacks from participating on an equal basis in large multi-member districts. Plaintiffs' expert witness, Dr. Gordon Henderson, analyzed voting returns, particularly from the recent Police Jury elections under the LeBlanc Plan (see plaintiffs' Exhs. 4–7, and 14) together with registration figures by race and by precincts, and determined that statistically there was a 98% probability of bloc voting among racial lines where a black candidate opposed a white candidate in Rapides Parish. Dr. Henderson did this analysis with the assistance of a computer, running two independent statistical analyses—the Pearson Correlation analysis and a retrogression analysis which statistically allows prediction from evenly mixed precincts. The returns, of course, show that black candidates occasionally receive some votes in 100% white precincts, but this in not particularly significant when the returns are viewed as a whole and especially are not significant in view of the computer analysis which takes all of the data into account, and using accepted statistical methods shows the level of bloc voting present here.

(25) For all practical purposes, historically Rapides Parish is a one-party Parish, with nomination by the Democrat Party tantamount to election. Neither the Party nor a dominant white slating organization has nominated, endorsed or slated any blacks.

■ (26) The constitutional insufficiency of an at-large or multi-member district arrangement is not demonstrated solely by showing that the cognizable minority has not been able to elect officials in the multi-member district in mathematical proportion to its voting potential. *White v. Regester*, 412 U.S. 755, 766, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 29 L.Ed.2d 363; *Zimmer v. McKeithen*, 485 F.2d 1297, at 1305. Instead, to demonstrate unconstitutionality:

* * * Plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than others in the district to participate in the political process and to elect legislators of their choice. *Whitcomb v. Chavis*, supra, 403 U.S. at 149–150, 91 S.Ct. [1858] at 1872. *White v. Regester*, supra, 412 U.S. at 766, 93 S.Ct. [2332] at 2339.

▮ (27) Whether a particular multi-member or at-large arrangement violates this standard is to be determined from the totality of circumstances of the particular case. In examining the totality of circumstances there is a panoply of factors which have been relevant to this determination; however, the presence or absence of any particular factor or set of facts standing alone is not dispositive of the issue. Rather, the examination must "[represent] * * a blend of history and intensely local appraisal of the design and impact of the Bexar County multi-member district in light of past and present reality, political and otherwise." *White v. Regester*, supra, 412 U.S. at 769–770, 93 S.Ct. at 2341.

(28) Plaintiffs have met their burden of proof, and the multi-member districting arrangement under the *LeBlanc* plan within the framework of facts and circumstances peculiar to the Parish of Rapides operates impermissibly to dilute or cancel out the voting strength of the black minority.

(29) The ultimate question is, of course, how these formal structures (multi-member districts, majority run-off), informal structures (such as the one-party system), and political context (history of racial discrimination, etc.) operate in combination. The evidence demonstrates that in combination, these factors operate to minimize or cancel out the voting strength of the black minority in the parish, and thereby deny to them equal access to the political process. The experiences of blacks running in the multi-member districts under the *LeBlanc* Plan show that these factors, particularly in combination with racial bloc voting, effectively denies blacks access to the political process. The predictable outcome is that blacks are consistently defeated in the multi-member districts. This is no accident, nor is the mere function of losing fair elections. Rather, given the totality of circumstances of the political context which includes bloc voting, a one-party system, and the vestiges of a long history of racial discrimination, the *LeBlanc* plan clearly stacks the deck against blacks by the use of multi-member

districts with a majority run-off requirement.

(30) Plaintiffs are entitled to judgment on both of the grounds urged. The proper standard to be applied is actually the *East Carroll* rule, since the plan in question—the *LeBlanc* Plan—is a court-ordered plan. However, we have made findings in the alternative that plaintiffs have met their burden under *White v. Regester* to demonstrate that the plan is also violative of the constitutional standards.

▮ (31) The Supreme Court in *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363, held that a district court judgment approving an apportionment plan is not binding on an application for reapportionment four years later, after initial decisions on constitutional apportionment had undergone considerable refinement in intervening Supreme Court decisions. In the instant case there has been a significant change in law, in that since both the *LeBlanc* and *Bradas* cases, the United States Supreme Court decided *East Carroll Parish School Board v. Marshall*, and held for the first time that a court-ordered plan which had been submitted by one of the parties was not subject to Section 5 scrutiny but was subject to the single-member district rule of *Connor* and *Chapman*. The amicus brief of the United States discusses this development in detail, and it will not be repeated here.

(32) The Fifth Circuit decision (*Bradas v. Rapides Parish Police Jury et al.*) which defendants urge bars the present action was decided on an inadequacy of proof. The Fifth Circuit decision noted specifically that the record below was practically devoid of the type of evidence required in these cases: "Consideration of the evidence below in light of these factors emphasizes the dearth of appellees' proof." Under these circumstances, particularly since plaintiffs have demonstrated that such proof can be presented, it can hardly be said that the class of black voters was forever foreclosed. Further, the *East Carroll* case was pending in the United States Supreme Court when *Bradas* was decided, and had the *Bradas*

plaintiffs sought review in that court, it is highly likely that the Fifth Circuit decision would have been overturned when the East Carroll opinion was handed down, as was done, for example in *Wallace v. House*, 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191.

## WHERE DO WE GO FROM HERE?

The multi-member districts must be disestablished. LeBlanc is out.

■ Neither courts nor police juries nor school boards are furnished with any specialized caliphers which enable them to extract from the general language of the law any mathematical formula which establishes what range of percentage deviations is permissible. Surely, the plan approved in *Bradas* (376 F. Supp. 690 at 694) which provides for nine single member districts with a maximum deviation of 2.2% achieves the primary goal of one man-one vote. When tested against proportional norms it affords to all groups a fair chance to realize full voting potential. On July 31, 1975, both public bodies favored this specific nine single member concept. The plan preserves to a substantial degree present lines and geographic boundaries. We adopt and order the implementation of the nine-member plan[2] for both public bodies.

## WHEN?

The School Board presently operates under the plan. The members serve staggered terms. The elections which had been scheduled for August 14, 1976 under the *LeBlanc* plan have been enjoined. In lieu thereof an election is to be scheduled under the nine-member plan. A date will be set when and if this judgment becomes final.

■ The Police Jury elections have been held under the *LeBlanc* plan. This election was mandated by federal court orders. To prevent needless expense and confusion, the tenure in office of the present members of the Police Jury (elected pursuant to federal court orders) is not to be disturbed. The nine-member plan is to be activated for the Police Jury at the next regular election for Police Jury scheduled to be held in Rapides Parish.

---

2. Statistics and boundaries appear at 376 F. Supp. at 694, and in the exhibits.